OCGLSKAC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  IN RE CUSTOMS AND TAX
   ADMINISTRATION OF THE KINGDOM
4  OF DENMARK
   (SKATTEFORVALTNINGEN) TAX
5  REFUND SCHEME LITIGATION,

                                      18 MD 2865 (LAK)
6
                                      Conference
7
   ------------------------------x
8                                     New York, N.Y.
                                      December 16, 2024
9                                     10:30 a.m.
   Before:
10               HON. LEWIS A. KAPLAN,

11                                    District Judge
                          APPEARANCES
12
   HUGHES HUBBARD & REED LLP
13       Attorneys for Plaintiff SKAT
   BY:  MARC WEINSTEIN
14       WILLIAM MAGUIRE
         NEIL OXFORD
15       GREGORY FARRELL

16  KOSTELANETZ & FINK, LLP
         Attorneys for the van Merkensteijn Defendants
17  BY:  SHARON McCARTHY
         DANIEL DAVIDSON
18
   WILMER CUTLER PICKERING HALE AND DORR LLP
19       Attorneys for Defendants Richard Markowitz, RJM Capital
   Pension Plan
20  BY:  PETER NEIMAN
         ANDREW DULBERG
21
   KATTEN MUCHIN ROSENMAN, LLP
22       Attorneys for Defendants Robert Klugman, RAK Investment
   Trust
23  BY:  MICHAEL M. ROSENSAFT
         DAVID GOLDBERG
24
   Also Present:  Max Brown
25                 Sean Mullen

OCGLSKAC

```
 1              (Case called)

 2              MR. WEINSTEIN:  Good morning, your Honor.  On behalf

 3    of Plaintiff, Marc Weinstein, Bill Maguire, Neil Oxford, and

 4    Greg Farrell from Hughes Hubbard & Reed.

 5              MS. MCCARTHY:  Good morning.  Sharon McCarthy and Dan

 6    Davidson.  And we have Max Brown in the courtroom.

 7              THE COURT:  Good morning.

 8              MR. NEIMAN:  Good morning.  Peter Neiman, Andrew

 9    Dulberg for the Markowitz defendants.

10              MR. ROSENSAFT:  Good morning, your Honor.  Michael

11    Rosensaft and David Goldberg for Mr. Klugman.

12              THE COURT:  Good morning.  Look, the first thing I

13    want to say, at the risk of destroying my reputation, is to

14    express appreciation for all of the amazing hard work that you

15    all have done, and apparently with considerable amity.  And

16    it's enormously impressive, and I am very appreciative of it.

17              That said, let us move to the question of the proposal

18    with respect to the handling of exhibits.

19              Let me just make sure I have it in front of me.

20              A good start, but it won't work.  First of all, my

21    deputy, who has been with me 20 years, and Judge Jones long

22    before that, and has been through an awful lot of complicated

23    trials, said if he has to mark exhibits, he is going to need a

24    half a dozen other people, and he still won't be able to do

25    anything in relation to the trial but mark exhibits.  So that
```

OCGLSKAC

1    doesn't work, that piece of it, and we have some suggestions.

2            The second thing that I observed was that there would

3    not be, under your proposal, an indisputably authentic record

4    of exhibits marked for identification but not received, and

5    that could happen in a bunch of ways.  It could happen because

6    they were excluded.  It could happen because they were marked

7    and used in some way that did not get them into evidence, such

8    as showing them to a witness for the purpose of refreshing

9    recollection.  And they could come into existence as

10   demonstratives that would not go to the jury, would not be

11   received in evidence and, nevertheless, there might need to be

12   a record of them.  So somehow that's got to be dealt with.

13           Now, my proposal is that before the week is out, your

14   delegated representatives meet with Andy and come to a better

15   solution.  And I don't think it's impossible.  Andy and I have

16   talked about it, but I am not going to try to prescribe it.

17   One possible component would be that each side would designate

18   someone who would initial received exhibits so that any

19   received exhibit would have two sets of initials on them, but

20   that's only one idea.  There may be other ways.  And something

21   would need to be done to make sure there is a chain of custody

22   maintained with respect to whatever the final electronic medium

23   is that contains everything.  But Andy and your logistical

24   folks will better know how to do this than I can do it

25   extemporaneously, and so I would like to have you do that.  And

1   the product ought to be a stipulation so that there is a

2   document signed by everybody in the record for this somewhat

3   unusual way of handling trial exhibits.

4           Any problem with that, folks?

5           MR. WEINSTEIN:  No, your Honor.

6           THE COURT:  OK.  Good.  That takes care of that.

7           What is your now best effort as to trial duration?

8   Because I am going to have to tell prospective jurors.

9           MR. WEINSTEIN:  Yes.  I think last time we were before

10  your Honor, we said five to six weeks.  I think now we would

11  say four to five weeks.

12          THE COURT:  OK.  That's four-day weeks.  Four-day

13  weeks.

14          MR. WEINSTEIN:  I'm sorry, I thought you said four to

15  eight.  Yes.

16          THE COURT:  Yes.  All right.  That's useful.

17          Now, I take it that there is pretty much nothing ripe

18  for decision with respect to the summary exhibits.  My

19  understanding is that as to the plan formation and first trade

20  exhibits, that's really off the table because the plaintiff has

21  given the quid pro quo required for the defendants to withdraw

22  their objection on the plaintiffs' exhibits in that category.

23  Is that right?

24          MR. DULBERG:  Your Honor, this is Drew Dulberg for the

25  Markowitz defendants.  I don't think that's right.  The

OCGLSKAC

1   objection that the defendants have is that the exhibits

2   themselves are argumentative because they include a column of

3   funds in the pension plan's account at the time that they began

4   trading.

5           THE COURT:  Yes.  Thank you for reminding me.  That's

6   overruled.

7           And on the trading charts, where are we?

8           MR. DULBERG:  I think we are OK on the trading charts,

9   your Honor, although, Mr. Weinstein may correct me.

10          MR. WEINSTEIN:  No.  Subject to any side finding

11  little errors, conceptually we are fine with the trading charts

12  on both sides, I believe.

13          THE COURT:  And does that include objections with

14  respect to the Elysium documents or not?

15          MR. DULBERG:  No.  The defendants maintain and

16  preserve all objections to the admissibility of the Elysium

17  documents, but we understand the Court has ruled on that

18  through the motion in limine.

19          THE COURT:  If there is any desire to preserve any

20  Rule 807 basis for admissibility, I note that the rule requires

21  a notice.  And while I think it's reasonably clear as to what

22  everybody is doing, a belt-and-suspenders approach might

23  warrant a notice.

24          As to the letter dated Friday night, I haven't had

25  enough time to think about it yet, so I am not going to do

OCGLSKAC

1    anything with respect to that.

2            I hesitate to broach the subject, but we have all

3    spent a lot of time thinking about how a jury would handle this

4    case and, indeed, whether we could enlist 12 people who would

5    be willing to sit for four or five weeks in the middle of

6    winter.

7            Is it still going to be the case that it's a jury

8    trial, or is there any movement on that subject?

9            MR. WEINSTEIN:  No movement, but in fairness, that

10   really has not been broached amongst the parties.

11           THE COURT:  Consider it to have been broached.

12           MR. WEINSTEIN:  Yes.

13           THE COURT:  Now, look, I take -- I don't want to know

14   who objects, if anybody objects.  You all have a right to a

15   jury trial, and I am going to give it to you if there is

16   anybody who wants it.  And I don't care.  And from my point of

17   view, a jury trial has the grand advantage of being over when

18   the verdict comes in and nothing more for me to do.  So I don't

19   view a bench trial as necessarily the most desirable thing in

20   the world here, but it might make this trial shorter and easier

21   and less expensive, and you know all the arguments.  I don't

22   have to tell you what they are.  If it's going to be non-jury,

23   I mean, I would take the jury waiver as late as the morning we

24   start or even into the trial, but it would make life simpler,

25   if it were ultimately going to be waived, to learn that sooner

OCGLSKAC

1    rather than later.

2    MR. WEINSTEIN:  We will confer with the defense on

3    that, your Honor, this week and try to get to the Court as soon

4    as we can.

5    THE COURT:  OK.

6    MR. WEINSTEIN:  May I go back for a moment?

7    THE COURT:  Please.

8    MR. WEINSTEIN:  Your Honor raised the 1006 charts

9    first.

10    THE COURT:  Uh-huh.

11    MR. WEINSTEIN:  I think you have discussed the

12    plaintiffs' Rule 1006 charts.  There are a bunch of proposed

13    defense 1006 charts, and there is some correspondence to the

14    Court on that as well.  I don't know if your Honor has had a

15    chance to --

16    THE COURT:  Well, some of that was on Friday, right?

17    MR. WEINSTEIN:  No.  Friday, the only -- two things

18    came in Friday.  One was about the, you know, handling of

19    electronic exhibits, and one was about Mr. Shah's conviction.

20    THE COURT:  I meant the 11th.

21    MR. WEINSTEIN:  Yes.  So that is -- yes, ECF 1249.

22    THE COURT:  That's the one I have not had time to deal

23    with.

24    MR. WEINSTEIN:  Understood.

25    THE COURT:  And I will try to do it quickly.

OCGLSKAC

1        Anything else that we can usefully discuss?

2        MR. NEIMAN:  Your Honor, we do have a couple of issues

3    we don't need to resolve today, but we want to tee them up for

4    you because I think it would be very useful to get them

5    resolved in advance of trial.

6        You know, the parties have spent a lot of time

7    exchanging proposed jury instructions.  It was a productive

8    exercise.  And there is one issue, I think, that we want to

9    call your Honor's attention to that, you know, is a core legal

10   dispute between the parties that, if you went our way, probably

11   would cut the length of the trial in half roughly.  And I think

12   both sides would benefit from knowing the answer to that

13   question in advance of openings, and that's the issue related

14   to pension qualification.

15       Happy to address it now if you are ready, but I assume

16   you are not, and happy to submit briefing if that would be

17   helpful.

18       THE COURT:  Well, look, I have that on my list too,

19   and I certainly understand why you raised it.  And I want to

20   make sure I brought down the right note.

21       Isn't the issue of qualification academic if there is

22   a determination -- and we will start with the easy one -- of

23   fraud based on ownership of shares, entitlement to the

24   dividend?  I don't see that the plaintiff needs the

25   qualification issue in order to recover.  And if there is no

OCGLSKAC

1    fraud, I don't see how it helps them.  And so I rather thought

2    there was some merit to the defense's position on that.

3              So what do you got to say?

4              MR. WEINSTEIN:  I agree with your Honor, the first

5    part of what your Honor said.  So if there is a finding of

6    fraud on ownership, it would be unnecessary to get to that

7    issue.  If there is not a finding of fraud on ownership, the

8    issue is, on what basis.

9              We can expect the defense to argue, or they may argue

10   the shares existed.  But let's say there is a false statement

11   as to ownership, but they are going to argue they had no

12   scienter, they didn't intend to defraud, they didn't know what

13   was happening behind the scenes.  So even if it's false, you

14   can't hit us for fraud.  We still would, on the other basis,

15   have the argument that both statements were false, and even --

16   meaning the ownership and the plan qualification.  And even if

17   the jury were to find no scienter as to the ownership, they

18   certainly can find scienter as to the pension plans themselves

19   and their qualification.  Those were things that were

20   exclusively in the control of the defendants.

21             THE COURT:  Mr. Neiman.

22             MR. NEIMAN:  Well, your Honor, there's two sets of

23   issues here.  The first is, What is the jury told they need to

24   find in order to find for the plaintiffs?  And we would

25   suggest, for reasons we laid out in the jury instruction

OCGLSKAC

```
1    submissions, that a finding only on the pension issue would not

2    be sufficient to satisfy the plaintiffs' burden.

3             THE COURT:  And review for me why that's so, in your

4    view.

5             MR. NEIMAN:  There are two reasons, your Honor.  There

6    is a plain language of the treaty reason.  The treaty says

7    whether exempt from tax or not and, therefore, it couldn't be

8    materially false to say that they were a tax exempt plan

9    because it's not a requirement that they be tax exempt.  So for

10   that reason, it wouldn't be sufficient to establish a material

11   false statement.

12            And second, I think if the only misrepresentation you

13   had in the case were the pension misrepresentation, the only

14   consequence of that would be in the quantum of refund that was

15   due and not whether a refund is due.  And a fight about the

16   quantum of refund that is due is exactly the kind of fight the

17   revenue rule doesn't permit them to bring.

18            For that reason, the jury should not be instructed

19   that such a misrepresentation would be sufficient to establish

20   their case.  And then I think once -- if we are right about

21   that, your Honor, then I think there are enormous 403 problems

22   with turning this case into a trial about the truth or falsity

23   of some other representation as to which our clients received

24   enormous amounts of legal advice.  Literally, it's going to be

25   half the testimony in the case, and as to which -- just to
```

OCGLSKAC

1     situate this for your Honor, the representation in question is

2     actually not even coming out of our clients' mouths.

3          What happens is, in order to qualify under the treaty,

4     you need to prove residence, and in order to prove residence,

5     you need to submit an application to the IRS and get a form

6     that the IRS sends back.  And the form, which is the IRS's

7     language, not ours, says, to the best of the IRS's knowledge,

8     this is a qualified pension plan.  I am paraphrasing.  And so

9     what they want to be able to do is to show our mens rea for

10    having elicited that statement from the IRS.  And everything we

11    sent to the IRS was 100 percent true, and that statement is 100

12    percent true.  So it's very remote from mens rea.  It is going

13    to be extraordinarily complex, and it isn't sufficient by

14    itself to establish material falsity.  So for all those

15    reasons, we think it should not be in this trial.

16         MR. WEINSTEIN:  It is sufficient to establish falsity.

17    The treaty -- despite the language that Defendants have cited

18    to, we put into, you know, one of the various footnotes of the

19    very lengthy jury instructions --

20         THE COURT:  The technical reports.

21         MR. WEINSTEIN:  Yes.  And the response to that -- at

22    some point, you have to cut off when you do a joint file on who

23    keeps going back and forth.  So the language in the 2006 treaty

24    is no different than the language in the 2000 treaty with

25    respect to the language that Mr. Neiman just quoted about

OCGLSKAC

1    whether it's tax exempt or not.

2            So it hasn't been superseded.  The technical

3    explanation is what that language was intended for.  The treaty

4    didn't change.  The same language that he is saying was in the

5    2006 treaty was in the 2000 treaty.  There is not a superseding

6    of the language in the treaty.  So the explanation still

7    applies.

8            With respect to the false statement itself, by asking

9    for a 27 percent -- the full refund as opposed to the half,

10    that is a representation under the treaty that you are a

11    qualified pension plan because that's what you have to be in

12    order to get that amount of money.

13            THE COURT:  Based on your interpretation of the

14    treaty.

15            MR. WEINSTEIN:  Well, not just mine, but the

16    Government's of the United States.

17            THE COURT:  And that is a statement by the Government

18    of the United States that was or was not joined in by the

19    Government of Denmark?

20            MR. WEINSTEIN:  That's a good question that I don't

21    offhand -- I don't have it in front of me, so I don't know

22    offhand.  I can't answer that right here.

23            THE COURT:  If it were not, Justice Scalia would have

24    said you don't look at it, right, because it's like a committee

25    report on a piece of legislation.

OCGLSKAC

1          MR. WEINSTEIN:  Your Honor, in fairness, I would have

2     to go back and look and provide the Court a better answer on

3     that.  So we can put in some writing on this.  Didn't realize

4     it was going to come up today, but --

5          THE COURT:  No, but it's a point we have already

6     started thinking about.

7          MR. WEINSTEIN:  Yep.

8          THE COURT:  Because we actually do read the footnotes.

9          All right.  If you both want to submit something on

10    this, I would be happy to have it between -- I mean, you work

11    out a schedule, but you need to get it to me by the 23rd at the

12    latest.  Let me know what the schedule is, please.

13          What else?

14          MS. MCCARTHY:  Your Honor, in the pretrial order, we

15    tried to come to an agreement on translations.  Throughout the

16    depositions in this case, which there were many, and they took

17    place in Copenhagen, many over, you know, Zoom, we used

18    uncertified translations.  And so to the extent that we are

19    offering depositions of, you know -- portions of depositions of

20    people where there were translations at issue, those are going

21    to be uncertified translations.

22          For some reason, SKAT is not willing to agree with us

23    that if we don't have a dispute over the uncertified

24    translation, that it's fine if we need to --

25          THE COURT:  If you don't have what?

OCGLSKAC

1          MS. MCCARTHY:  We don't have a dispute over the

2     content of an uncertified translation, that we can offer an

3     uncertified translation into evidence, if it comes to that.

4          So I would just like to try to work this out now

5     because it's going to be an enormously expensive proposition if

6     we are required to go back now, so close to trial, and get

7     things certified.

8          THE COURT:  Especially over Christmas.

9          MS. MCCARTHY:  Correct.

10          THE COURT:  What about it?

11          MR. WEINSTEIN:  That was how they decided to do a lot

12     of these depositions, and it actually caused a problem, and we

13     noted this a number of times during depositions, where the

14     translation isn't necessarily correct.  They are asking a

15     question in English based on an incorrect translation that the

16     interpreter -- and, I'm sorry -- yes, the interpreter on their

17     own has to now adopt as the question, and it's being put to a

18     witness who is preferring to read the Danish.  So it creates an

19     issue.

20          It's hard to say in advance would we have no problem

21     with an uncertified translation unless we knew which one we are

22     talking about.  They have a lot of Danish documents on this

23     exhibit list.  That's another issue.  There is so much in this

24     exhibit list and deposition designations that are, obviously,

25     not permitted based on your Honor's various rulings.  So for us

OCGLSKAC

1    to go and just look at every uncertified translation they put

2    on a list and say we don't have an issue, that's a lot of work.

3    Most of the time they are probably focusing on one or two

4    sentences.  So unless we knew more, we certainly can't agree to

5    uncertified translations are fine.

6         THE COURT:  So Ms. McCarthy, why can't you pinpoint

7    the ones that you think you have a problem with?

8         MS. MCCARTHY:  We will, your Honor.  And to the extent

9    there is not a disagreement, then we would ask that the

10   pretrial order be amended so that we can agree that if there is

11   no dispute over the contents of an uncertified translation,

12   that it can be used as evidence.

13        THE COURT:  I can tell you from a lot of years of

14   experience how many -- a number of horror stories about this

15   problem, including the president of a French company who sat on

16   that witness stand being cross-examined in a case where he was

17   resisting an enforcement of a contract that he had negotiated

18   in Brooklyn, in English, which, to be more precise, it was

19   negotiated by lawyers in English in his presence, and he

20   claimed he was taken advantage of because it was an English

21   language document and an English language negotiation.  And the

22   parties each had their own interpreter in court, and there were

23   disputes over the interpretations of the testimony.  And during

24   a lengthy wrangle between the lawyers, the witness looked at me

25   and said, "Judge, it would be so much easier if the lawyers

OCGLSKAC

1    would let me testify in English."

2              We don't want to have that happen in this case, of

3    course.  There are other stories which I will share with you at

4    some point at a bar association meeting over a drink.  But

5    anyhow, I am sure you will work it out.

6              MR. GOLDBERG:  David Goldberg for Mr. Klugman.  One

7    additional item on the translations.  This may be something

8    that I want to add onto our list to work out, if possible.

9    There are a number of documents that may have evidentiary value

10   untranslated.  SKAT conducted extensive investigations in

11   Danish, and the jury may benefit from seeing that, the mere

12   fact that the investigation happened, a date, and elsewhere.

13             So the pretrial order doesn't speak to that issue, but

14   we just wanted to make sure that that was preserved and on our

15   agenda for discussions because we would certainly be looking to

16   offer some of those documents in support of our defenses as

17   well.

18             THE COURT:  That's at a level of generality that I

19   can't cope with here today because I am having a hard time

20   imagining a document that would have evidentiary value to a

21   jury if produced in Danish.

22             MR. GOLDBERG:  Just, for example -- and it goes to the

23   issue of the expense of the translations in Danish in

24   particular.  If it were Spanish, it would be different.  But we

25   know from past experience that it was $48,000 to translate 21

OCGLSKAC

1    documents -- 21 pages.  SKAT conducted investigations in Danish

2    for each of the pension plans starting in 2015, after receiving

3    the whistleblower tip, et cetera, and those -- they have

4    produced it.  It's their file to us.  There is no dispute that

5    there is an investigatory file starting in 2015.  And some of

6    this is in English, but to translate this would be hundreds of

7    thousands of dollars per plan.  It's simply impossible to do.

8         We would like the opportunity to discuss with SKAT and

9    propose for your Honor's resolution, if necessary, if there is

10   a dispute, the idea that we could proffer to the jury some of

11   these investigatory files, their files.

12        THE COURT:  You certainly have my permission to

13   discuss with SKAT anything you want to discuss with them.

14        MR. GOLDBERG:  Very well.

15        THE COURT:  Which brings me to the last item on my

16   agenda.

17        I know there have been -- I don't know anything about

18   them, but I know there have been some attempts at resolving all

19   or part of this matter.  Seems to me we might be getting to the

20   time where those efforts, if they are ever going to happen,

21   should get into gear, and possibly particularly in light of the

22   events of last week.  You are all great lawyers, and you know

23   it as well as I know it.  But just a word on that.

24        MR. WEINSTEIN:  Your Honor, two issues.  One is, on

25   the Elysium documents, there's, at least in our minds, some

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

OCGLSKAC

```
1    uncertainty at this point on what, if anything, SKAT will need

2    to do at trial, as opposed to all the briefing we have put on

3    these to your Honor, with respect to the admissibility.  And

4    what I mean by that is, with respect to their authenticity -- I

5    understand -- it's not -- they preserved objections, but they

6    understand the Court's ruling.

7              So we would need to do the following:  One, call a

8    witness from Deloitte just to discuss, you know, having gotten

9    the Court order to go seize, and images of stuff that they did

10   that, how they did it; and then, secondly, to the extent there

11   is still an objection on authenticity grounds, we will have one

12   of our experts literally have to go through -- we put it in a

13   briefing to the Court -- but start to show the jury the

14   matching of, Here's documents that the defendants themselves

15   got; they match the ones that are in the Elysium database.  And

16   there's all sorts of different things that the expert can tick

17   and tie.  It seems to me it's not the best use of the jury's

18   time.

19             So I just want to get clarity as to what -- at this

20   point, are there ongoing objections for which we are going to

21   have to do those things?  That was one thing, and then there is

22   one other.

23             MR. DULBERG:  The answer is yes.  Like every other

24   party seeking to introduce evidence, the plaintiff needs to

25   establish authenticity and foundation and relevance, and so
```

OCGLSKAC

1     that's the burden.

2           There have been millions of pages produced,

3     purportedly from a database seized in Dubai.  Many of the files

4     in this production are unintelligible, are unrelated.

5     Certainly, the ones that match the defendants' account

6     statements, we have no objection to their admissibility.  It's

7     documents that the defendants in this case have never seen that

8     the plaintiff says were seized from some source in Dubai and

9     needs to lay a foundation in order to admit into evidence.

10          THE COURT:  Mr. Weinstein, are there any documents

11    that might be used at the trial by the plaintiff that the

12    defendants have never seen?

13          MR. WEINSTEIN:  Well, not -- I think what Mr. Dulberg

14    meant is that at the -- contemporaneously their clients haven't

15    seen them.  They certainly have seen them now for years.  I

16    think what he is saying is some set of records the defendants

17    themselves got from Solo, so there is, of course, no objection

18    to those, even though identical ones were seized.  However, the

19    trades that they say they never saw at the time, I believe

20    that's the ones that Mr. Dulberg is saying he would still

21    object.

22          THE COURT:  This is trades in the loop pertaining to

23    their accounts?  Is that what we are talking about?

24          MR. WEINSTEIN:  Correct, and account statements and

25    the like that are the exact same kind of records that they

OCGLSKAC

```
1    received, that tie to bank records that we are going to have to

2    put in the case to show that these things tie.  That's exactly

3    right, your Honor.

4              THE COURT:  Look, I commend to both of you two

5    decisions in this district.  One is Chevron Corporation v.

6    Donziger, 974 F .2d 362 at 689 to 693, and United States v.

7    Prevezon Holdings, 319 F.R.D. 459 at 465 to 68.  And I think

8    those cases are firmly in my mind, and it's only fair to tell

9    you that, and you can figure out what you need.

10             Ms. McCarthy.

11             MS. MCCARTHY:  Not on this issue.  Are we done on this

12   issue?

13             MR. WEINSTEIN:  On this issue, I have nothing further.

14   We will, obviously, take those into account.

15             THE COURT:  The first one had to do with getting into

16   evidence what appeared to be bank records from an Ecuadorian

17   bank which one side wouldn't agree were even bank records, let

18   alone authentic, and so forth.

19             MR. WEINSTEIN:  It's, to some extent, a preview as to

20   why we might be taking some jury time on these issues, but --

21             THE COURT:  Look, I understand that, but if it becomes

22   apparent that there is a ruling or two on a couple of these

23   documents, I would imagine that would set the scene for not

24   having to go through it more than a couple of times.

25             MR. WEINSTEIN:  The second thing --
```

OCGLSKAC

1        THE COURT:  And I don't have enough facts to make that

2   ruling right now.

3        MR. WEINSTEIN:  Just on the timing of your Honor's

4   rulings on deposition designations, the objections to them.

5   The only reason I am raising this for SKAT's case is we need to

6   cut the videos of them.  I don't know if -- if the Court is

7   going to do it at trial, it takes some time to --

8        THE COURT:  Given the volume of stuff in this trial,

9   it would be unreasonable to believe that I am going to go

10  through hundreds of pages of deposition designations and make

11  rulings line by line in advance of trial.  Just unreasonable.

12  OK.

13       MS. MCCARTHY:  Two small issues, your Honor.  One is

14  that our client, John van Merkensteijn, is 80 years old and not

15  well.  He will be here for parts of the trial, but he won't be

16  here every day.  He just can't do it.  I was wondering if the

17  Court gives any sort of instruction to the jury about the need

18  for the defendants to be in the courtroom, or what -- that they

19  shouldn't make any assumptions if they don't see people here.

20  Is there -- would you like me to draft something and propose it

21  to the Court?

22       THE COURT:  I will consider anything you draft.

23       MS. MCCARTHY:  Very good.

24       The second issue, your Honor, is one that I know is

25  very sensitive to the Court involving personal phones.  We have

OCGLSKAC

```
1    provided to the Court a proposed order, I believe, already for
2    electronic devices, our computers and things like that, to come
3    into the courtroom.  We understand, and we hope that we will be
4    provided with a room somewhere in the courthouse where we can
5    have our, you know, binders, and we can meet and confer after
6    the trial day or during breaks.
7             I would ask that the Court -- the Court may not know
8    this, but downstairs, the CSOs are very well trained.  They ask
9    us, "Which judge are you going to see?"  And if we say
10   Judge Kaplan, even if we have a court pass, they take our phone
11   because you don't allow it in the courtroom, which we all are
12   honoring, and there is no way we are going to violate that
13   rule.  But --
14            THE COURT:  You have made my day.
15            MS. MCCARTHY:  We will need to have it in that room,
16   Judge, because for our computer system, I cannot log into my
17   firm's files without my phone as a second authentication.
18            THE COURT:  Right.  Sure.
19            Andy, have we made arrangements for a plaintiffs' and
20   a defense room yet?
21            THE DEPUTY CLERK:  Yes.  We are going to have access
22   for the jury room to 26A and for the jury room to 24B.
23            THE COURT:  OK.  Two nice big rooms.
24            MS. MCCARTHY:  OK.  So do you want us to submit a
25   separate order that permits us to bring the phones in, even
```

OCGLSKAC

1    though we are coming to see you, or will --

2            THE COURT:  Yes.

3            Andy, do we need to do that?

4            THE DEPUTY CLERK:  Judge, I think a memo to the CSOs

5    allowing the people to otherwise be able to bring in their

6    phones, that they can keep them, and the attorneys knowing that

7    they have to be left in the war rooms --

8            THE COURT:  OK.  We will send a memo downstairs today.

9            MS. MCCARTHY:  Thank you so much.

10           THE COURT:  OK.  Great.  I won't see you before

11   New Year's, but Merry Christmas and happy new year.

12           (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25